**COMMUNITY FOR CREATIVE NON–VIOLENCE, et al., Plaintiffs,**

**v.**

**James J. CARVINO, et al., Defendants.**

**Civ. A. No. 86–3271.**

United States District Court, District of Columbia.

Dec. 17, 1986.

As Amended Feb. 11, 1987.

**828**

Mark A. Venuti, Venuti & Lopes, Washington, D.C., for plaintiffs.

Michael L. Martinez, Asst. U.S. Atty., Washington, D.C., for defendants.

## MEMORANDUM

OBERDORFER, District Judge.

Plaintiffs are the Community for Creative Non-Violence ("CCNV"), an unincorporated association of persons, and Mitch Snyder, a member of and spokesperson for CCNV. Defendants are James J. Carvino, Chief of the United States Capitol Police, and the Capitol Police Board.

Plaintiffs applied for a demonstration permit with the Capitol Police Board on November 19, 1986, and sought in their permit request to conduct a vigil on the Capitol Grounds, to serve dinner on Thanksgiving day and each succeeding day, and to place on the grounds a statue of a man, woman, and child hovered over a heating grate.

The statue is described by plaintiffs as a "modern day creche" and is entitled "Third World America: A Contemporary Nativity." The huddled figures and heating grate sit atop a base that bears the inscription "And still there is no room at the Inn." The base is approximately seven and one-half feet in length, five and one-half feet in width, and has an estimated weight of five hundred (500) pounds. The statue is purportedly fragile and valued at over $15,000. It has been the subject of previous litigation. *See Community for Creative Non-Violence v. Hodel,* 623 F.Supp. 528 (D.D.C. 1985). Plaintiffs intend, if permitted, "to keep the statue on Capitol Grounds until Congress passes emergency legislation to provide shelter for the homeless." Complaint at 4, ¶ 9; Declaration of James J. Carvino at 3, ¶ 10 (Defendants' Exhibit 3). Recently plaintiffs have posted a sign alongside the statue which bears a message to the effect that the Congress does not sponsor the demonstration.

The permit was issued pursuant to section 156 of Article XIX of the Traffic and Motor Vehicle Regulations for the United States Capitol Grounds (the regulation). That regulation, promulgated by the Capitol Police Board in 1976 on the authority of Public Law 570, 80th Congress, 60 Stat. 720 (40 U.S.C. § 212b), established limitations on the issuance of permits for demonstrations on the Capitol Grounds. Specifically, it

(1) limited to 300 the number of participants in a demonstration on the grounds, other than in the area west of the Capitol (section 156(a)(1));

(2) limited each permit to a period of not more than 7 days (section 156(a)(2));

(3) forbade any permit which authorized "demonstration activity having a duration of more than 24 consecutive hours" (section 156(a)(2)); and

(4) required that "immediately upon the conclusion of each demonstration activity

... *all facilities* used in connection with such activity *shall be removed* by the applicant from the Capitol Grounds, and the applicant shall take such action as may be necessary so as to leave the Capitol Grounds in as reasonably *good and clean condition as that which existed immediately prior to the commencement of such activity."* (Emphasis added.)

Section 156(c) provided:

With respect to any permitted demonstration activity on the Capitol Grounds, *movable facilities* ... reasonably necessary as an integral part of demonstration activity shall be permitted provided that prior notice was given as part of the application for a permit. [Emphasis added.]

On November 24, 1986, a document captioned "Permit Relating to Demonstration Activities of United States Capitol Grounds," was issued to plaintiffs over the signatures of the Chairman of the Capitol Police Board and the Sergeant At Arms of the Senate for the period November 28—December 3, 1986. The permit has been twice renewed for seven day periods; most recently on December 11, 1986. The permit describes the area of the Capitol Grounds to be involved and states dates, time and duration. The time stated is "commencing at 1200 hours and ending with 24 consecutive hours of each commencement each day."

The duration stated is: "Less than 24 consecutive hours each day." Under the caption "Props and Equipment," the permit describes, in addition to tables and utensils appropriate for a Thanksgiving Dinner:

A wakeful vigil consisting of one statue and base ($7\frac{1}{2} \times 5\frac{1}{2}$) weighing 500 lbs; Four stancheons and velvet covered rope around base of statue.... All approved Props and Equipment shall not remain within Capitol Grounds for more than 24 consecutive hours each day. Vehicle access to the Plaza shall be permitted for purposes of loading/unloading Props and Equipment each day.

Plaintiffs object to the permit requirement that they remove the statue from the Capitol Grounds every 24 hours. They contend that this is burdensome and unnecessary. They claim that it is difficult to move the 500 pound statue the 250 yard distance to the nearest point outside the Capitol Grounds because of its weight and fragility. They question whether any significant government interest is served by the gesture involved in moving the statue for an instant each 24 hours.

When the defendants refused to honor the plaintiffs' request for relief from the required move every 24 hours, they filed this suit together with an application for a temporary restraining order, and a motion for a preliminary injunction against enforcement of the 24–hour requirement of section 156(a)(2). On November 26, 1986, Judge John Garrett Penn, sitting as Motions Judge, granted plaintiffs' motion for a temporary restraining order which relieved them from the required movement of the statue every 24 hours. Judge Penn granted the temporary restraining order primarily because the plaintiffs satisfied him that the burdens imposed upon them to remove the statue momentarily every 24 hours were not narrowly tailored to serve any significant government interest. *See United States v. Grace,* 461 U.S. 171, 177, 103 S.Ct. 1702, 1706, 75 L.Ed.2d 736 (1983). After a hearing on December 9, 1986, this Court extended Judge Penn's order until December 19, 1986, or until there was a ruling on the motion for preliminary injunction.

Meanwhile, on December 9, 1986, plaintiffs filed an amended complaint which alleged that the entire 1976 regulation (on which the parties relied as authority for the renewable permit to demonstrate with props, including the statue) was invalid because it was not authorized by 40 U.S.C. § 212b. The statute provides that the Board:

shall have exclusive charge and control of the *regulation and movement* of all vehicular and *other traffic,* including the parking and impounding of vehicles and limiting the speed thereof, within the United States Capitol Grounds; and said

Board is authorized and empowered to make and enforce all necessary regulations therefor and to prescribe penalties for violation of such regulations.... [Emphasis added.]

According to plaintiffs, the statute merely authorizes regulation of traffic. Moreover, plaintiffs argue, in support of their theory that 40 U.S.C. § 212b could not have been intended to regulate demonstrations, that a companion statute (since declared to be unconstitutional) forbade all demonstrations on the Capitol Grounds. *Jeannette Rankin Brigade v. Chief of Capitol Police*, 342 F.Supp. 575 (D.D.C.) (three judge court), *aff'd mem.*, 409 U.S. 972, 93 S.Ct. 311, 34 L.Ed.2d 236 (1972).

Defendants counter by pointing out that 40 U.S.C. § 212b refers not only to vehicular traffic, but also to "other traffic." They further urge that plaintiffs' challenge to the validity of the regulations came late in the proceedings. It has implications which cannot be appraised adequately in this interlocutory proceeding. The issue deserves a careful analysis of such considerations as whether the long and uncontested interpretation of 40 U.S.C. § 212b, literally on the doorstep and before the eyes of Congress, gives it effect similar to that given by the re-enactment rule. Moreover, plaintiffs' seek renewals of their permits to keep the statue on the Capitol Grounds through the winter, or until Congress provides satisfactory relief for the homeless. However, even if plaintiffs were to prevail on their claim that section 156 is not authorized by 40 U.S.C. § 212b so that defendants could be enjoined from enforcing the 24–hour condition imposed by the regulation and enforced by the condition in the permit, the result would be the opposite of what plaintiffs seek to achieve. But for the permit issued pursuant to the regulation, the disputed statue would probably not be permitted on the Capitol Grounds at all, or at least for the substantial time sought by plaintiffs. *See* Declaration of James J. Carvino, *supra*. The regulation, as construed in the permit, carves an exception into what appears to be a flat prohibition against the presence on the Capitol Grounds of any structure or change in the landscape of the Capitol Grounds, unless approved by Congress.[1] If the regulation and thus the permit are not valid, the presence of the statue is probably not authorized.[2]

The question raised by the original complaint remains: whether the regulation and permit requirement that demonstrations, including props, be removed every 24 hours violates plaintiffs' First Amendment rights? After the December 9 hearing, the Court invited defendants to file an affidavit from someone involved in the 1976 creation of the underlying regulation stating its legislative history, with particular reference to what government interest the draftsmen sought to serve when they required that each demonstration terminate and that its sponsor remove all props and equipment

---

1. 40 U.S.C. § 68, titled "Buildings on reservations, parks, or public grounds," states:

   On and after August 24, 1912 there shall not be erected on any reservation, park, or public grounds, of the United States within the District of Columbia, any building or structure without express authority of Congress.

   40 U.S.C. § 162, titled "Architect of the Capitol; powers and duties," states:

   The Architect of the Capitol shall perform all the duties relative to the Capitol Building performed prior to August 15, 1876, by the Commissioner of Public Buildings and Grounds, and shall be appointed by the President: Provided, That no change in the architectural features of the Capitol Building or in the landscape features of the Capitol Grounds shall be made except on plans to be approved by Congress.

2. Recent Interior Department regulations prohibit the use of stationary structures in Lafayette Park, with the exception of certain speaker's platforms. This regulation defines structures to include "statues." 36 C.F.R. § 50.-19(e)(11)(1)(D). The preamble to the regulation explained that the Department originally planned to exclude all structures from the Park because they could not design less restrictive alternatives, but relented to permit speaker's platforms. 51 Fed.Reg. 7565 (March 5, 1986). *See also White House Vigil for ERA Committee v. Watt*, 717 F.2d 568 (D.C.Cir.1983); *United States v. Thomas*, 574 F.Supp. 197, 198 (D.D.C.1983), *aff'd.*, 753 F.2d 167 (D.C.Cir.1984), *cert. denied*, —— U.S. ——, 106 S.Ct. 195, 88 L.Ed.2d 164 (1985).

every 24 hours. In response, defendants have filed the affidavit of George M. White, the incumbent Architect of the Capitol who was a member of the U.S. Capitol Police Board in 1976 when regulation 156 was promulgated.

According to Mr. White, the Board designed the regulation so that it could "be applied fairly to all, with as little control as possible, and so as to remove, to the maximum extent possible, the element of discretion...." According to Mr. White, the regulation does not involve itself in the question of what particular props may remain, but rather promotes the goal of content neutrality by providing that all props must be removed within the prescribed period. Mr. White also stated that the 24–hour limitation and removal requirement served Congress' desire not only to remain neutral with respect to demonstrations on the Capitol Grounds, but also "to give the appearance of remaining neutral and not sponsoring any demonstration." The requirement that all props be removed daily, according to Mr. White, "break[s] the chain, even if only for a moment," thereby helping Congress maintain its position that it does not sponsor any particular demonstration or prop.

Most significant in respect to the statue in question, Mr. White's affidavit states that draftsmen of the regulation in question were cognizant of 40 U.S.C. §§ 68 and 162. These sections restrict changes in architectural or landscape features of the Capitol Grounds and specifically proscribes the placement of structures there without specific congressional approval. According to Mr. White, the draftsmen of the regulation developed the 24–hour removal requirement to, among other things, balance the congressional proscription against structures being added to the Capitol Grounds with the rights of persons or groups who sought to demonstrate. Finally, Mr. White's affidavit asserts a traffic control purpose for the regulation.

The White affidavit establishes, as the record before Judge Penn did not, that the 24–hour removal requirement serves a significant government interest in assuring that the props used by demonstrators are mobile so that they not become or appear to become permanent structures on the Capitol Grounds. The 24–hour requirement relieves the authorities of the need to make fine distinctions between what is temporary and what is permanent. By any definition, a structure which is movable, and is, in fact, moved every 24 hours, is not permanent. Thus, the 24–hour rule serves a significant government interest in providing a content neutral test of whether a prop introduced on the Capitol Grounds as part of a demonstration is a prop, or is, in fact, an impermissible structure or landscape change. If removal every 24 hours of a statue of this weight, dimension and configuration of this one is not feasible, that may well be proof that the statue is either a "structure" or a "change of landscape" requiring specific approval of Congress.

Removal of the statue every 24 hours (or its removal from the demonstration entirely if plaintiffs find removal every 24 hours too burdensome) does not foreclose plaintiffs' demonstration. Alternative means of expression on the Capitol Grounds are expressly authorized by the permit, which has so far been freely renewed. Nor have alternate means of expression on the Capitol Grounds, or in other prominent places, been in any way foreclosed. Although the burden imposed on plaintiffs' First Amendment rights by the 24–hour removal requirement is significant, and the government interest in removal of this particular statue may seem trivial, the White affidavit makes it more probable than not probable that the background, purpose, and application of the regulation in the context of the several relevant acts of Congress will establish that the 24–hour removal requirement serves Congress' interest in management of the Capitol Grounds in a way that does not generally and significantly infringe First Amendment rights.

Obviously, this conclusion does not preclude defendants from relieving plaintiffs from some or all of the 24–hour movement

832

requirement if they, or the relevant congressional authorities, should in their discretion decide to do so. Nor does this ruling preclude the defendants from continuing to exercise their First Amendment rights by assuming the risk and the burden of complying with the regulation and the permit requirements that the demonstration be concluded and the statue removed from the Capitol Grounds every 24 hours.

As stated in *Clark v. Community for Creative Non-Violence:*

> Symbolic expression ... may be forbidden or regulated if the conduct itself may constitutionally be regulated, if the regulation is narrowly drawn to further a substantial governmental interest, and if the interest is unrelated to the suppression of free speech.

468 U.S. 288, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984). Defendants will probably prevail on the merits of their contentions that the regulation is authorized by statute and that the 24–hour removal requirement is adequately tailored to serve a significant government interest while leaving plaintiffs ample alternative channels of expression. Accordingly, an accompanying order will deny plaintiffs' motion for a preliminary injunction, while maintaining the status quo until the temporary restraining order expires on its own terms.