**COMMUNITY FOR CREATIVE NON–VIOLENCE, et al.,**
**Plaintiffs,**

v.

**James J. CARVINO, et al., Defendants.**

**Civ. A. No. 86–3271.**

United States District Court,
District of Columbia.

May 11, 1987.

Mark A. Venuti, Washington, D.C., for plaintiffs.

Joseph E. diGenova, U.S. Atty., Royce C. Lamberth, Michael L. Martinez, Asst. U.S. Attys., Judiciary Center, Washington, D.C., for defendants.

## MEMORANDUM

OBERDORFER, District Judge.

Plaintiffs are the Community for Creative Non-Violence ("CCNV"), an unincorporated association of persons, and Mitch Snyder, who speaks for CCNV. Defendants are James J. Carvino, Chief of the United States Capitol Police, and the Capitol Police Board ("Board").

Plaintiffs seek a declaration that section 156(a)(2) of Article XIX of the Traffic and Motor Vehicle Regulations for the United States Capitol Grounds is unconstitutional because it impermissibly infringes on first amendment rights of expression, and invalid because its promulgation was not authorized by statute. That section is one of a number of regulations adopted by the Police Board in 1976 to govern demonstration activity on the Capitol Grounds. Plaintiffs are challenging that part of subsection 156(a)(2) that provides: "no permit shall authorize demonstration activity having a duration of more than 24 consecutive hours." The matter is here on the parties' cross-motions for summary judgment.

The present dispute arose out of a demonstration plaintiffs commenced on November 27, 1986 and ended sometime after Congress convened in January 1987. On November 19, 1986, plaintiff CCNV applied to the Capitol Police Board for a demonstration permit. CCNV requested a permit to serve dinner on Thanksgiving Day and on each succeeding night on the Capitol Grounds to homeless people in the area, and to maintain a vigil in support of the homeless. Plaintiffs intended to continue their vigil on the Capitol Grounds until Congress passed emergency legislation to provide shelter for the homeless or until winter ended, whichever came first. Complaint at 3, ¶ 9. As part of the demonstration, plaintiffs requested permission to include as a "prop" a 500 pound statue, with a base seven and a half feet in length and five and a half feet in width, entitled "Third World America: A Contemporary Nativity." The statue, which plaintiffs describe as a modern day creche, depicts a black family (mother, father and child) huddled on a steam grate, and bears the legend "And still there is no room at the Inn."[1] Around the base of the statue, plaintiffs intended to place four stanchions and velvet covered rope.

On November 24, 1986, the Capitol Police Board granted plaintiffs a demonstration permit. The permit covered a seven day period beginning at noon on Thanksgiving day, November 27, 1986, and ending December 3, 1986. The placement of the statue on the Capitol Grounds as part of the vigil was specifically provided for in the permit. However, pursuant to section 156(a)(2) of the traffic regulations, the permit provided that the duration of each demonstration was to be "[l]ess than 24 consecutive hours each day" and that "[a]ll approved Props and Equipment shall not remain within Capitol Grounds for more than 24 consecutive hours each day."

Plaintiffs allege that they were told initially by defendants that they would have to leave the demonstration site for a few minutes every 24 hours, but that the statue

---

1. This statue has been the subject of prior litigation. *See Community for Creative Non-Violence v. Reid,* 652 F.Supp. 1453 (D.D.C.1987); *Community for Creative Non-Violence v. Hodel,* 623 F.Supp. 528 (D.D.C.1985).

could remain in place and would be guarded by the Capitol Police during plaintiffs' absence. Plaintiff's Memorandum in Support of Application for Temporary Restraining Order and Motion for Preliminary Injunction at 3 (filed Nov. 26, 1986) (hereinafter "Memorandum for Preliminary Injunction"). Subsequently, however, plaintiffs were informed that in order to comply with the permit, they would be required to move the statue off the Capitol Grounds once every 24 hours. According to defendants, the statue was 250 yards from the perimeter of the Capitol Grounds.

On November 26, 1986, plaintiffs requested that the statue be exempted from the 24 hour requirement. They explained that because of the size, weight, fragility and expense of the statue (which plaintiffs value at over $15,000), moving it off the Capitol Grounds once every twenty-four hours would be unduly burdensome. Defendants denied the request, citing section 156(a)(2) of the regulations.

Plaintiffs then filed this civil action, along with a motion for a temporary restraining order to prohibit defendants from enforcing section 156(a)(2) "against the plaintiffs for maintaining their modern day creche on Capitol Grounds." Proposed Order for Preliminary Injunction at 2 (attached to Memorandum for Preliminary Injunction, *supra*). Plaintiffs explained that the statue was "a core element of their vigil, and a central part of the message they wish to convey." Memorandum for Preliminary Injunction at 11. They argued that the 24 hour rule would "make it impracticable to include the statue in the vigil," *id.* at 4, and thus would deny plaintiffs their first amendment rights of expression. A hearing on the motion was held before Judge Penn on November 28, 1986. After hearing argument, Judge Penn granted the temporary restraining order effective until December 9, 1986. *See CCNV v. Carvino,* 648 F.Supp. 476 (D.D.C.1986). Subsequently, plaintiffs obtained a second demonstration permit for the period of December 3–10, 1986.

At a hearing on December 9, 1986, this Court extended the temporary restraining order for another 10 days, until December 19, 1986, or until a decision on plaintiffs' motion for a preliminary injunction was issued, whichever came first.

On December 17, 1986, plaintiffs' motion for a preliminary injunction was denied, *see CCNV v. Carvino,* 654 F.Supp. 827 (D.D.C. 1987), and on December 29, 1986, the Court of Appeals denied plaintiffs' emergency motion for an injunction pending appeal. *CCNV v. Carvino,* C.A. 86–3271 (D.C.Cir. Dec. 29, 1986). Both courts concluded that plaintiffs had not demonstrated the requisite likelihood of success on the merits.

### I.

Although the statue has been removed and the demonstration has ended, plaintiffs persist in their challenge to section 156(a)(2), noting that they may wish to demonstrate again on the Capitol Grounds and arguing that the defendants' adherence to the traffic regulation threatens any such demonstration. Plaintiff Snyder declares that next winter "it is likely that plaintiffs will (if allowed) maintain the same type of presence on the Capitol Grounds, including the statue, as was maintained this year...." Declaration of Mitch Snyder at 1 (filed Jan. 21, 1987). Defendants represent that in light of this declaration, "defendants do not believe that they can at this time successfully maintain that this matter is moot." Defendants' Second Supplemental Memorandum (filed Jan. 27, 1987). Because a live case or controversy is a constitutional prerequisite to jurisdiction, it is necessary to address that issue sua sponte.

In *Burke v. Barnes,* —— U.S. ——, 107 S.Ct. 734, 736, 93 L.Ed.2d 732 (1987), the Supreme Court explained that it is not enough for a case to be "live" at the time that the complaint is filed. In order to be a justiciable case or controversy, the case must be "live" at the time of decision. Furthermore, "[t]he Article III case or controversy requirement is as applicable to declaratory judgments as it is to other forms of relief." *Conyers v. Reagan,* 765 F.2d 1124, 1127 (D.C.Cir.1985); *see also Golden v. Zwickler,* 394 U.S. 103, 108, 89

S.Ct. 956, 959, 22 L.Ed.2d 113 (1969). Our Court of Appeals has stated:

> In determining whether a request for declaratory relief has become moot, "the question ... is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, *of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."*

*Conyers,* 765 F.2d at 1128 (quoting *Preiser v. Newkirk,* 422 U.S. 395, 402, 95 S.Ct. 2330, 2334, 45 L.Ed.2d 272 (1975)) (emphasis in original).

■ Under the circumstances, the facts alleged by plaintiffs present a live case or controversy, ripe for review at this time. In *Juluke v. Hodel,* 811 F.2d 1553 (D.C.Cir. 1987), CCNV challenged regulations prohibiting the placement of parcels on the sidewalk in front of the White House. The court of appeals rejected the Government's argument that the case was moot, stating that:

> It is possible to argue that the civil case is now moot if the appellants no longer intend to demonstrate and thus will not in the future be subject to prosecution under the challenged regulations. However, neither the Government nor the appellants raise this mootness argument either in their briefs or in oral argument before this court. This is not surprising because the appellants sought both declaratory and injunctive relief in the civil action. Complaint for Declaratory and Injunctive Relief ¶ 2; *see Better Gov't Ass'n v. Department of State,* 780 F.2d 86, 91 (D.C.Cir.1986) (Even if a challenge to a specific application of a regulation to a party is rendered moot, a challenge to the facial validity of the regulation may still present a live controversy.). Furthermore, no one doubts that the members of CCNV are likely to continue with demonstrations at the White House and therefore fear future prosecution.

*Juluke,* 811 F.2d at 1559 n. 22. The material facts here are identical to those found in *Juluke.* These similarities require the court to exercise jurisdiction over plaintiffs' dispute.

## II.

In 1976, the Capitol Police Board promulgated regulations covering "vehicular and pedestrian traffic on United States Capitol Grounds in connection with demonstration activities." Traffic & Motor Vehicle Regulation for the United States Capitol Grounds, Article XIX, at 59. Section 153 of these regulations provides that "[i]n the interest of the orderly movement of vehicular, pedestrian, and other traffic on the Capitol Grounds ... no demonstration activity ... shall be carried out on the United States Capitol Grounds except pursuant to the terms of a valid permit issued by the Capitol Police Board...." Other sections impose conditions for the issuance and receipt of demonstration permits. Only section 156(a)(2) of the regulations is challenged by plaintiffs here. That section provides:

> (a) The issuance of permits under this article shall be subject to the following limitations:
>
> . . . .
>
> (2) No permit shall be issued for a period of more than 7 consecutive days, and no permit permit shall authorize demonstration activity having a duration of more than 24 consecutive hours....

The gravamen of plaintiffs' original complaint and of the motion for preliminary relief was that the "24-hour requirement" violated plaintiffs' first amendment rights of expression. An amended complaint added a claim that the regulation was invalid because its promulgation was not authorized by statute. The second count, which logically and prudentially precedes plaintiffs' constitutional challenge, will be addressed first.

## A.

Count II of plaintiffs' second amended complaint challenges section 156(a)(2) on the ground that the Board had no authority to adopt it. Capitol Police Board regulations governing demonstrations on the Cap-

itol Grounds, including section 156(a)(2), were promulgated pursuant to 40 U.S.C. § 212b. That section provides in part that:

> The Capitol Police Board ... shall have exclusive charge and control of the regulation and movement of all vehicular and other traffic, including the parking and impounding of vehicles and limiting the speed thereof, within the United States Capitol Grounds; and said Board is authorized and empowered to make and enforce all necessary regulations therefor and to prescribe penalties for violation of such regulations....

According to the Senate Report which explained section 212b, "[t]he purpose of the bill [was] to provide for the promulgation of traffic regulations pertaining to the Capitol Grounds." Sen.Rep. 144, 1947 U.S.Code Cong. Service 1280.

George M. White is the architect of the Capitol and was a member of the U.S. Capitol Police Board at the time section 156 of the regulations was promulgated. He explains the purpose of section 156(a)(2):

> The Congress has maintained the position that it in no way sponsors [an] event by requiring that the statue and other props relating to that demonstration be removed on a daily basis, within every twenty-four (24) hour period.[2] This is an effort, as contemplated when these regulations were promulgated, to "break the chain," even if only for a moment, and to set forth the proposition that the Congress is indeed not sponsoring this particular message *and that while the object may remain for a period of time it is not in fact permanent* or otherwise authorized by the Congress.

Affidavit of George M. White at 2–3 (filed Dec. 10, 1986) (emphasis added); *see also* Declaration of James J. Carvino at 3 (filed Dec. 5, 1986).

White further explains that the Board "was also cognizant when it promulgated these regulations of the restriction regarding the placement of permanent structures on the U.S. Capitol Grounds." White Aff.

at 3. *See* 40 U.S.C. §§ 68, 162. Section 162 of title 40 provides that "no change in the architectural features of the Capitol Building or in the landscape features of the Capitol Grounds shall be made except on plans to be approved by Congress." Section 68 further provides that "there shall not be erected on any reservation, park, or public grounds, of the United States within the District of Columbia, any building or structure without express authority of Congress." White explains: "The U.S. Capitol Police Board in promulgating [section 156(a)(2)] sought to balance the Congressional proscription against permanent structures being added to the U.S. Capitol Grounds with the rights of persons or groups who sought to demonstrate." White Aff. at 3.

Finally, White proffers that the Board "was also attempting to ensure that the free flow of vehicular and pedestrian traffic was maintained at all times." *Id.* at 4; *see also* Carvino Decl. at 2. Defendants explain that, "by requiring that no demonstration continue for longer than any consecutive twenty-four [hour] period, [section 156(a)(2)] ensures that demonstrations can be moved or altered, on a daily basis...." Defendants' Memorandum of Law in Support of Their Motion For Summary Judgment and in Opposition to Plaintiffs' Motion for Preliminary Injunction at 11 (filed Dec. 5, 1986) (hereinafter "DMSJ").

In sum, White suggests that regulation section 156(a)(2) was designed to serve three principal goals: (1) to guard against the appearance of Congressional sponsorship, (2) to avoid the addition of permanent structures on Capitol Grounds, and (3) to promote the free flow of traffic. Elsewhere, the government identifies two additional interests served by section 156(a)(2). *Id.* at 6. Adding these to the list, section 156(a)(2) also serves (4) to keep the forum open to others, and (5) to aid the Capitol Police in keeping day-to-day control over the Capitol Grounds. Defendants reason that, in light of its goals, section 156(a)(2) is

---

**2.** Plaintiffs note that the Capitol Police Board, not Congress, adopted the regulation which requires that all props be removed on a daily basis. Response to Affidavit of George M. White at 4 (filed Dec. 12, 1986).

reasonably related to the purposes of the enabling legislation—that is, the regulation of "all vehicular and other traffic ... within the Capitol Grounds."

Plaintiffs, in response, argue that section 212b does not empower the Board to regulate demonstrations. In support, plaintiffs note that when section 212b was enacted, a companion statute (later declared unconstitutional) prohibited all demonstrations on the Capitol Grounds. *See Jeannette Rankin Brigade v. Chief of Capitol Police,* 342 F.Supp. 575 (D.D.C.) (three judge court) *aff'd mem.,* 409 U.S. 972, 93 S.Ct. 311, 34 L.Ed.2d 236 (1972). Plaintiffs reason that Congress could not have intended the Board to regulate activity which was prohibited altogether.

Plaintiffs further argue that section 156(a)(2) does nothing to further the free flow of traffic or promote the Board's day-to-day control over the Grounds. Plaintiffs note that the Capitol Police select the site of the demonstration, presumably with traffic needs in mind, and have the inherent authority to regulate movement on the Capitol Grounds as the needs of traffic dictate. In this circumstance, plaintiffs argue, section 156(a)(2) does nothing to promote the free flow of traffic on the Capitol Grounds. If anything, section 156(a)(2) impairs the flow of traffic by requiring demonstrators to remove themselves and their props from the Capitol Grounds once every 24 hours at a time of the demonstrators' choosing. According to plaintiffs, it would be mere coincidence if the time selected by the demonstrators happened to further the free flow of traffic. Plaintiffs further argue that section 156(a)(2) is not rationally related to the Board's interest in keeping a forum available to others. As Judge Penn pointed out, "notwithstanding the fact that the statue is moved every 24 hours, the permit authorizes the plaintiffs to return the statue to the same location on the Capitol Grounds." 648 F.Supp. at 479.

On the first point, defendants have the better of the argument. Plaintiffs do not dispute that demonstrations are a form of traffic, regulation of which is entrusted to the Board. Nor do they challenge the Board's authority to regulate demonstrations generally or the validity of its regulations with the exception of subsection 156(a)(2). The fact that demonstrations were prohibited at the time of the grant of authority does not restrict the Board's power to regulate demonstrations now that they are permitted.

Plaintiffs' other arguments have more weight. After careful consideration, however, these arguments do not compel the conclusion that section 156(a)(2) is invalid.

A permit authorizing demonstrators to move, inter alia, 500 pound statues onto the Capitol Grounds threatens to violate Congressional proscriptions against the alteration of the landscape of the Capitol Grounds or the addition of structures on those grounds.[3] According to George White, section 156(a)(2) was designed in part to avoid this result. As noted in the 1986 Memorandum,

> the 24–hour removal requirement serves a significant government interest in assuring that the props used by demonstrators are mobile so that they not become or appear to become permanent structures on the Capitol Grounds. The 24–hour requirement relieves the authorities of the need to make fine distinctions between what is temporary and what is permanent. By any definition, a structure which is movable, and is, in fact, moved every 24 hours, is not permanent. Thus, the 24–hour rule serves a significant government interest in providing a content neutral test of whether a prop introduced on the Capitol Grounds as part of a demonstration is a prop, or is, in fact, an impermissible structure or landscape change. If removal every 24 hours of a statue of this weight, dimension and configuration of this one is not feasible, that may well be proof that the statue is either a "structure" or a

---

**3.** In the December 17, 1986 Memorandum, it was observed that "[b]ut for the permit issued pursuant to the regulation, the disputed statue would probably not be permitted on the Capitol Grounds at all, or at least for the substantial time sought by plaintiffs." 654 F.Supp. at 830.

"change in landscape" requiring specific approval of Congress.

654 F.Supp. at 831.

■ In other words, section 156(a)(2) of the regulation ensures that the Board does not exercise its authority under section 212b by regulating traffic in a manner proscribed by sections 68 and 162 of title 40. It is not ultra vires for the Board to adopt and administer traffic regulations consistently with the requirements of statutes proscribing placement of permanent statues without Congress' permission. To be valid, a regulation need only be "reasonably related" to the purposes of the enabling legislation. *See Mourning v. Family Publications Service, Inc.*, 411 U.S. 356, 369, 93 S.Ct. 1652, 1660–61, 36 L.Ed.2d 318 (1973); *Kyle v. ICC*, 609 F.2d 540, 543 (D.C.Cir.1979); *Dickinson v. Bell*, 580 F.Supp. 432, 434 (D.D.C.1984), *affd.;* 757 F.2d 372 (D.C.Cir.1985). Under the circumstances, section 156(a)(2) is "reasonably related" to section 212b's grant of authority.

### B.

This litigation has focused on section 156(a)(2) as it pertains to the Police Board's authority to require the movement of plaintiffs' statue every 24 hours. The injury alleged by plaintiffs in this case was the burden of moving their large, heavy, fragile, and valuable statue 250 yards off the Capitol Grounds and 250 yards back to their demonstration site each day. In their second amended complaint, plaintiffs explain that "[t]he statue is the focal point of plaintiffs' demonstration and vigil; it is the message and its presence is essential." Complaint at 5, ¶ 16. Plaintiffs complain that the 24 hour requirement as applied to the statue would render it difficult if not impossible to resume their vigil in a meaningful and effective way. Consequently, plaintiffs' proposed order for a preliminary injunction would have prohibited defendants from enforcing section 156(a)(2) "against the plaintiffs *for maintaining their modern day creche* on Capitol Grounds." Proposed Order for Preliminary Injunction (attached to Memorandum for Preliminary Injunction, *supra* ) (emphasis added).

■ Plaintiffs have not argued that they were injured by section 156(a)(2) as it applied to them apart from their statue. They do not argue, in other words, that requiring them to move any other element of their demonstration off the Capitol Grounds momentarily every 24 hours impermissibly infringes upon their first amendment rights of expression. In fact, they note that the move is likely to occur at a time when it will not be witnessed by their audience. *See* Memorandum in Support of Motion for Preliminary Injunction at 4 (filed December 4, 1986). Absent the statue, the plaintiffs have neither alleged nor proffered evidence that they would suffer actionable harm by interrupting the balance of their demonstration once every 24 hours. Because plaintiffs have not alleged that they have been injured by application of section 156(a)(2)'s application apart from the requirement that they move the statue, it is inappropriate to address the validity of the regulation as it pertains to some other contexts.

This conclusion is in accord with the Supreme Court's decision in *United States v. Grace*, 461 U.S. 171, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983). In *Grace*, the Supreme Court was confronted with a challenge to a statute which prohibited certain expressive activity in the "Supreme Court Building or grounds." 40 U.S.C. § 13k (1982). Upon review, the Court held that the statute was unconstitutional as applied to the sidewalks surrounding the Court building. Over Justice Marshall's objection, the Court intimated no view as to the constitutionality of the statute as applied to other parts of the Supreme Court grounds, even though the statute did not distinguish between the sidewalks and other areas of the Supreme Court grounds. As our Court of Appeals explained,

The reason the *Grace* Court considered § 13k exclusively in the context of public sidewalks was that it could thereby avoid a needless constitutional inquiry into the status of the other parts of the Supreme Court grounds and building. There was

no need to determine whether those areas were also public forums, because "the controversy presented by appellees concerned their right to use the *public sidewalks.*" 103 S.Ct. at 1706 (emphasis added). Early in its opinion, therefore, the Court stated that it would "address only whether the proscriptions of § 13k are constitutional as applied to the public sidewalks." *Id.*

It is beyond dispute that courts are permitted to assess the constitutionality of a statute or regulation by drawing distinctions that are not explicitly embraced within the text of the provision. *White House Vigil v. Clark*, 746 F.2d 1518, 1532 n. 97 (D.C.Cir.1984). So here, it is only appropriate to address the validity and constitutionality of the regulation as it relates to the requirement that plaintiffs move the statue every 24 hours.

### III.

Plaintiffs challenge section 156(a)(2) on the ground that it unconstitutionally infringes on their First Amendment rights of free speech. "Time, place, and manner" restrictions, like the one here, are permissible so long as the restrictions

> are justified without reference to the content of the regulated speech, ... narrowly tailored to serve a significant governmental interest, and ... leave open ample alternative channels for communication of the information.

*Clark v. Community For Creative Non-Violence*, 468 U.S. 288, 293, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984); *see also Juluke*, 811 F.2d at 1559.

Judging section 156(a)(2) against these standards, it is clear that the regulation is content neutral. It is also clear that section 156(a)(2) leaves open ample alternative channels for communication. Neither of these issues is in genuine dispute. However, plaintiffs contend that 156(a)(2) is not narrowly tailored to further a significant government interest. This argument does not withstand scrutiny.

The Government has identified several interests served by section 156(a)(2). That regulation was promulgated, in part, to effectuate Congress' desire to avoid the appearance that it sponsors demonstration activity; in part, to effectuate the prohibitions against building or landscape changes not previously approved by Congress; and, in part, to guarantee that the Police Board could maintain control over demonstration activity on a daily basis on the Capitol Grounds.[4] These are significant interests. Plaintiffs argue, however, that these interests either are not served by section 156(a)(2) or could be served equally well by less intrusive means. For example, plaintiffs argue that the Government's interest in avoiding the appearance of sponsorship could be served equally well if the demonstrators post a sign disavowing sponsorship by Congress, as plaintiffs did here.

The Supreme Court has cautioned courts against finetuning challenged regulations. In *Clark*, the Supreme Court, reversing the court below, stated: "We are unmoved by the Court of Appeals' view that the challenged regulation is unnecessary, and hence invalid, because there are less speech-restrictive alternatives that could have satisfied the government interest...." 468 U.S. at 299, 104 S.Ct. at 3072. In a similar legal context, the Court explained: "The less-restrictive-alternative analysis ... has never been a part of the inquiry into the validity of a time, place, and manner regulation. It is enough that the ... restriction substantially serves the Government's legitimate ends." *Regan v. Time, Inc.*, 468 U.S. 641, 657, 104 S.Ct. 3262, 3271, 82 L.Ed.2d 487 (1984) (footnote omitted). And in *White House Vigil v. Clark*, our Court of Appeals cautioned:

> The expertise of courts lies in determining whether an agency's decision is within the zone of constitutionality, not in choosing between options within that zone. A court may not require that the agency adopt the "least restrictive alter-

---

**4.** As noted above, the defendants argue that section 156(a)(2), "by requiring that no demonstration continue for longer than any consecutive twenty-four [hour] period, ensures that demonstrations can be moved or altered, on a daily basis as the daily situations change on the Capitol grounds." DMSJ at 11.

**752**

native," thereby substituting its judgment for that of the regulators. In short, if the regulation lies within the zone prescribed by the first amendment it is constitutional and must be affirmed as such by a court before which it is challenged.

746 F.2d at 1531–32; *see also Juluke,* 811 F.2d at 1560.

■ Section 156(a)(2) was designed to govern demonstrations generally, and should not "be judged solely by reference to the demonstration at hand." *Clark,* 468 U.S. at 296–97, 104 S.Ct. at 3071. Thus, it does not follow from the fact that the plaintiffs here, through their voluntary actions, satisfied the "appearance of sponsorship" concern that the regulation is overbroad as generally applied. Furthermore, the particular hardship suffered by these particular plaintiffs, who chose to make a fragile 500 pound statue the focal point of their demonstration, does not establish that section 156(a)(2)'s requirements are generally oppressive. Viewed in the context of the myriad of situations to which section 156(a)(2) applies, it is narrowly tailored to further substantial government interests, without being burdensome. The regulation requires only that a demonstration on the Capitol Grounds come to an end, and that props be removed, once every twenty-four hours. In *Clark,* the Supreme Court expressed serious doubt that the First Amendment required the government to permit a 24–hour vigil in Lafayette Park. This Court has similar reservations about plaintiffs' right to conduct a 24–hour vigil on the Capitol Grounds. In any event, section 156(a)(2)'s burden on First Amendment rights is indirect and insubstantial, and is permissible in light of the several goals furthered by its single requirement.

For the foregoing reasons, an accompanying order will grant defendants' motion for summary judgment and dismiss plaintiff's complaint.